J-S47028-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: Z.D.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.A.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 650 MDA 2019 |

Appeal from the Order Entered April 10, 2019
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): A-12-2018

| | | |
|---|---|---|
| IN RE: C.J.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.A.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 651 MDA 2019 |

Appeal from the Order Entered April 10, 2019
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): A-13-2018

BEFORE: DUBOW, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    FILED MARCH 18, 2020

R.A.P. (Mother)[1] appeals from the orders granting the petitions of the

Lackawanna County Office of Youth and Family Services (OYFS) and

involuntarily terminating her parental rights to her sons, Z.D.N., born in

_____

[1] The court voluntarily terminated the parental rights of Children's father, G.N. (Father). Father did not appeal from the termination of his parental rights, nor has he participated in this appeal.

February 2015, and C.J.N., born in July 2016 (collectively, Children). We affirm.

The trial court set forth the factual and procedural history of this matter as follows:

> This case concerns the termination of parental rights due to the parental medical neglect and mental incapacity of [Mother], concerning [Children]. [OYFS obtained emergency protective custody of Children] on February 27, 2017 due to a referral regarding seven (7) month[-]old infant, C.J.N., who presented to the Moses Taylor Emergency Room unresponsive, malnourished, . . . and near fatality. Specifically, "severe malnutrition and metabolic derangements including hyponatremia, chloremia, AKI, and metabolic acidosis complicated by seizure-like activity with no EEG correlate and an abnormal MRI . . . continuing to suggest some sort of hypoxic event." C.J.N. received medical treatment for approximately three (3) months at Geisinger Medical Center in Danville, Pennsylvania. [On April 17, 2017, all parties stipulated to the entry of orders finding Children dependent.] C.J.N. treated with Pediatric Good Shepherd Rehabilitation Center until release to kinship foster placement in May 2017 with paternal grandfather [(Foster Parent) with whom Z.D.N. was also placed]. During C.J.N.'s hospitalization period, Z.D.N. presented with low developmental stages, missed medical visits, and overdue immunizations. Z.D.N.'s scoring necessitated early intervention services.
>
> Mother disagreed with the occurrence of neglect or malnutrition, and denied any need for medical attention, citing that C.J.N. "just had a cold" or "was sick with the flu," and "he was dehydrated." Mother unwaveringly maintained this position throughout OYFS intervention and involvement. As a result, Mother incurred the following criminal charges: Endangering the Welfare of a Child, 18 Pa.C.S. § 4304(a)(1), and Recklessly Endangering Another Person, 18 Pa.C.S. § 2705. On January 14, 2019, Mother pled nolo contendere to Recklessly Endangering Another Person, 18 Pa.C.S. § 2705, and received a twenty-four (24) month

probationary period.[2]  OYFS did not participate in any plea negotiations, recommendations, or conditions.

OYFS engaged Mother in a family service plan targeted at providing an appropriate support system for [Children] with appropriate supervision at all times.  Upon release from incarceration [in June of 2017], Mother obtained a drug and alcohol assessment.  The assessment advised detox from Subutex[3] combined with inpatient rehabilitation, and a completely sober lifestyle.  In response, Mother utilized no drug and alcohol support.  Mother did not attend either inpatient or outpatient rehabilitation, did not detox from Subutex, did not attend AA or NA programs, and did not obtain a sponsor earning "moderate compliance," and "minimum progress," with the drug and alcohol aspect of the family service plan.  Mother cited that she chose a Sub[utex] program instead of the recommended inpatient, outpatient or partial rehabilitation.  OYFS presented Mother with several options and opportunities, yet Mother refused all services.

Mother received therapy through Dr. [John] Kuna, but failed to obtain a psychiatric evaluation rendering [a] diagnosis.  Mother's failure to obtain a psychiatric evaluation earned "minimum compliance," and "no progress," with the mental health aspect of the family service plan.  Mother testified that Dr. Kuna provided the following non-medical therapy: "calming techniques, coping techniques, drug and alcohol.  Just different things to help you cope with addictions."

Mother maintained sporadic employment, offset by Mother's ability to obtain and maintain appropriate housing earning "moderate compliance," with the employment aspect of the family service plan.

_____

[2] Mother entered into a conditional plea agreement whereby she initially entered a plea of nolo contendere to endangering the welfare of children, but could enter a nolo contendere plea to the lesser charge of recklessly endangering another person if she cooperated with OYFS.  Mother's Ex. 5, Lackawanna County Court of Common Pleas Nolo Contendere Plea Colloquy, 12/13/17.

[3] Subutex is used to treat opioid addiction.

Mother failed to complete the "Safe-Care Program," which encompasses safety, medical, and parent-child interactions. [Mother, who was nine-months pregnant in August of 2017, missed two appointments for C-sections, and ultimately had a stillbirth.] Since August of 2017, Mother did not reengage with the "Safe-Care Program." In fact, by February-March 2018 Mother became difficult to contact and deemed a no-show at appointments. Importantly, Mother never advanced to the "medical" module of the "Safe-Care Program," which educates medical safety. She stated: "I did not complete Safe[-]Care."

Similarly, Mother maintained sporadic participation in the OYFS "Mother's Group," designed to connect and relate parents involved with OYFS. Mother only attended eleven (11) of the twenty-nine (29) group sessions. Mother did not successfully complete the program. Her sporadic attendance rendered any educational response or progress futile. Id. In fact[,] Mother's non-attendance for three (3) consecutive months triggered her unsuccessful discharge. Mother admitted: "I didn't keep up with moms' groups and stuff."

Mother attended line-of-sight visitation with [Children], admitting that she carelessly arrived fifteen (15)-twenty (20) minutes late for approximately seventy-five (75) percent of her visits. Described as "generally late," Mother lacked any apparent bond with C.J.N. Of note, Mother required "redirection," when observed intentionally commenting on C.J.N.'s weight several times. For example, "she would make comments about him being fat . . . that he was very chunky, he was overweight. And she had to be redirected several times not to say that due to the reason . . . of him almost starving to death . . . . He was eating too much. That he looked like the grandfather." Mother admitted to making such commentary, but minimized the frequency of the comments and minimized her intent. In that same line, Mother described C.J.N. as a "big boy." Later on[, during] cross-examination, Mother shifted blame to [Father] and recanted commenting about C.J.N.'s weight. Her commentary indicated the presence and risk of future neglect to [Children], especially an inability to comprehend or reconcile why [Children] were in OYFS care. Also, Mother grossly discerned the appropriate portions of food or beverage for approximately fifty (50) percent or half of the visits. Mother incorrectly commented that C.J.N. "drank too much," or "ate too much." In regard to Z.D.N., Mother lacked a consistent bond,

both waning and strengthening at times. For these reasons, Mother failed to progress upward with visitation alternatives.

Overall, Mother merely demonstrated "minimum compliance," with the family service plan. Mother failed to achieve progress in a protective capacity towards [Children]. Mother failed to demonstrate any changed behavior or new efforts to avert future medical neglect and near fatality of [Children]. Despite OYFS involvement, Mother's behavior remained unchanged.

Trial Ct. Op., 1/2/20, at 1-5 (record citations and some formatting altered).

On March 28, 2018, OYFS filed petitions to terminate Mother's parental rights to Children. On March 21, 2019, the trial court conducted a hearing on the petitions. OYFS presented the testimony of four OYFS employees, Kristin Wight, Theresa Chmelik, Carey Mazur, and Lisa Kanavy. Mother testified on her own behalf.[4] We summarize the relevant aspects of the testimony as follows.

As to OYFS's concerns regarding Mother's ability to care for Children safely, Ms. Wight, the OYFS caseworker, testified that Children came into

_____

[4] The case was initially heard before Judge Michael J. Barrasse on July 16, 2018. However, by order dated January 11, 2019, Judge Barrasse recused himself. A different jurist presided over the hearing on March 21, 2019. At the hearing on March 21, 2019, Mother was represented by counsel, and Attorney Kevin O'Hara represented Children as guardian ad litem and legal counsel. See In re T.S., 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming the ability of an attorney-guardian ad litem to serve a dual role and represent a child's non-conflicting best interests and legal interests); In re Adoption of L.B.M., 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

OYFS care shortly after Mother transported C.J.N. to the hospital unresponsive and malnourished on February 27, 2017. N.T., 3/21/19, at 22, 25, 32. At that time, C.J.N. had seizure-like activity due to malnutrition, as well as severe diaper rash. Id. at 94. C.J.N. was diagnosed with failure to thrive. Id. Ms. Wight described C.J.N.'s condition as a "near fatality." Id. at 32.

Ms. Wight noted that, in August of 2017, during OYFS intervention with Children, Mother was expecting another child and missed two scheduled C-sections. Id. at 47-48. At a meeting with OYFS on August 23, 2017, caseworkers encouraged Mother to call the hospital to schedule a C-section. Id. Mother eventually went to the hospital several days later, but suffered a stillbirth. Id. at 52. Ms. Wight testified that the stillbirth raised further concerns because Mother did not respond the OYFS's urging to receive medical care and "[w]hen she did then receive the medical care, there was a death that occurred with her unborn child." Id. at 51. Ms. Wight had further concerns about Mother's "ability to listen to feedback and be in a realistic mindset about what was happening and to continue with reality." Id. at 52.

Ms. Wight indicated that throughout Children's time in care, Mother denied that anything occurred that could have led to C.J.N.'s condition in February of 2017. Id. at 32, 37. Mother suggested that OYFS was "out to get her." Id. at 104-05. Ms. Wight explained that it was an ongoing concern that "[a]fter the case with [OYFS] was indicated and it was deemed a near fatality, [and] after seeing medical records and speaking with us about what

the doctors had said about that, [Mother] did not feel that occurred." Id. at 37. Ms. Wight noted that "if [Mother] didn't recognize what happened, she can't adequately protect [Children] from that occurring again and cannot take the protect[ive] measures to trust doctors, to take [Children] to doctors, and to follow-up on medical needs that were extremely life-threatening in this case." Id. at 38.

Additionally, as part of the family service plan, Mother was asked to participate in a Safe-Care program to learn about safety, health, and bonding and parent-child interaction. Id. at 44. Theresa Chmelik, who ran the program, testified that Mother completed the safety aspect of the program, but did not complete the health or parent-child module. Id. at 118-19, 121. Further, Mother failed to complete the parent-child interaction portion. Id. at 120-21.

Ms. Chmelik noted that she temporarily suspended Safe-Care programming after the stillbirth in August of 2017, because Mother was too upset and emotional during sessions. Id. at 119. Ms. Chmelik attempted to meet with Mother in February and March of 2018. Id. at 120-21. Mother failed to show for a meeting on March 19, 2018, nine days before OYFS filed the petition to terminate Mother's parental rights. See id. at 121. Ms. Chmelik contacted Mother, and Mother stated she forgot about the meeting. Id. at 121. Ms. Chmelik thereafter closed out her involvement in the case. Id.

Lisa Kanavy, a visitation supervisor, expressed concerns that Mother referred to C.J.N. as "very chunky," "chubby," and overweight at visits, although Ms. Kanavy did not think C.J.N. appeared overfed. Id. at 133, 147. Ms. Kanavy redirected Mother because C.J.N. was brought into care because he "nearly starved to death." Id. at 133. Additionally, Ms. Kanavy testified that, at approximately one-half of Mother's thirty visits, Mother failed to recognize the appropriate amount of food or water to give C.J.N. Id. at 153.

Ms. Kanavy testified that OYFS could not ensure that Mother could safely care for either of the children because Mother never acknowledged her part in what occurred with C.J.N. Id. at 156. Indeed, Ms. Kanavy noted that, throughout her involvement, Mother asserted that C.J.N.'s initial hospitalization was the result of a cold. Id. at 151. The visits remained line-of-sight, due to Mother's criminal charges and lack of progress and compliance with the family service plan. Id. at 137-38.

Ms. Wight noted that OYFS did not consider Mother's failure to attend Children's follow up medical appointments in its decision to seek termination of Mother's parental rights. Ms. Wight explained that Foster Parent harbored resentment towards Mother and did not inform Mother or OYFS of the dates and times of the appointments, making it impossible for Mother to attend. N.T., 3/21/19, at 66-70. Ms. Wight acknowledged that, given C.J.N.'s diagnosis, it would have been important for Mother to attend Children's medical appointments. Id.

As to Mother's nolo contendere plea, Ms. Kanavy testified that she spoke with Mother's counsel in the criminal matter and reported that Mother's visits with Children went well. Id. at 145. However, Ms. Wight stated that she did not know how Mother met the conditions of the plea agreement and noted that she had difficulty contacting the District Attorney's office. Id. at 111-12.

As to other portions of the family service plan, Ms. Wight testified that, although Mother received mental health treatment throughout the case, she failed to obtain a psychiatric evaluation as required. N.T., 3/21/19, at 32-33. Further, Mother failed to attend a drug and alcohol treatment program to wean herself from Subutex, although Ms. Wight acknowledged that Mother's drug screens were consistently negative for non-prescribed drugs. Id. at 26-29, 71-73, 90-91. Moreover, Mother failed to participate consistently in a mother's group run by OYFS. Id. at 163.

As to Children's best interest, Ms. Wight testified that, when Z.D.N. was initially removed from Mother's care, he was behind developmentally. Id. at 39. After a month or two with his Foster Parent, Z.D.N. no longer needed early intervention. Id. Further, she noted that C.J.N. was generally healthy following his release from rehabilitation to his paternal grandfather's home in May 2017. Id. at 39-40.

Ms. Wight further testified that Children are doing well together in the foster home as they have stability, support, and extended family. Id. at 40. Ms. Wight observed numerous interactions in the foster home, and Children

appeared very comfortable and loving. Id. at 42. Ms. Wight believed that Children are bonded to their foster family, noting they run up to Foster Parent and his wife. Id. Ms. Wight testified it would be in Children's best interests to terminate Mother's parental rights. Id. at 54-55.

Ms. Kanavy testified that Mother is very engaging with both Children.[5] Id. at 133. Ms. Kanavy asserted that visits went well and Mother was very nurturing, brought toys and gifts, and would engage with Children throughout. Id. at 145.

Nevertheless, Ms. Kanavy testified that C.J.N. is not bonded to Mother. Id. at 134-35. Ms. Kanavy acknowledged that there is a bond between Mother and Z.D.N., and that the bond increased, decreased, and then increased over the course of Mother's supervised visitations. Id. at 150. Despite the bond between Z.D.N. and Mother, Ms. Kanavy testified that the bond should be severed because of the safety risk Mother poses to Z.D.N. Id. at 155-56. Further, Ms. Kanavy testified that it was important to maintain the bond between Children. Id. at 156.

Mother testified on her own behalf. Mother stated that she took C.J.N. to a pediatrician on January 27, 2017, and was told that because he had a fever, diarrhea, and was vomiting, he had an ear infection. Id. at 182. The pediatrician prescribed an antibiotic. Id. According to Mother, C.J.N. began

_____

[5] Ms. Kanavy noted that, although Mother visited consistently, Mother was late for 75% of her visits. N.T., 3/21/19, at 136-37.

recovering, but "just over three weeks later[, C.J.N] started with his fever and vomiting and diarrhea." Id. By February 26, 2017, C.J.N. looked "horrible," and she took him to the emergency room. Id.

Mother acknowledged that in January of 2017, the pediatrician told her to take C.J.N. to a primary care physician as soon as possible. However, Mother believed that the pediatrician meant to bring C.J.N. for immunizations as soon as possible. Id. at 243. Mother testified that she "went to registration to make the appointment," but was told she already had a preexisting appointment for immunizations on March 16, 2017. Id. at 238.

When asked whether she agreed with C.J.N.'s diagnosis of failure to thrive, Mother responded she was "having a tough time with this," and explained that C.J.N. appeared well-nourished and well-developed in January of 2017, but "then all of a sudden" she was accused of "neglecting [C.J.N] his entire life."[6] Id. at 184. Mother noted that C.J.N. had a lactose sensitivity and issues with his formula, which caused some weight issues. Id. at 231-32. However, Mother conceded that while C.J.N. was in her care, his weight for his age decreased from around the 40th percentile at the time of his birth to under the 1st percentile at seven months old. Id. at 232.

_____

[6] On cross-examination, counsel for OYFS confronted Mother with a report from C.J.N.'s February 26, 2017 hospitalization which indicated that C.J.N.'s weight was low at the January 27, 2017 appointment. See id. at 237.

With respect to the missed C-section appointments and the stillbirth in August of 2017, Mother claimed that she was unaware of her first appointment until OYFS told her about it. Mother then had to reschedule the second appointment "because [Father] was laying on the floor tripping on cough pills." Id. at 208. Mother then attended a visit with Children and then went to the hospital.

With respect to Safe-Care, Mother admitted that she did not complete the programming. Id. at 209. Mother noted that Ms. Chmelik suspended the programming because Mother "treated it like a counselling session" and "got too emotional." Id. When Ms. Chmelik attempted to restart the programming in February of 2017, there was an initial misunderstanding where the appointment would take place. Id. at 211. Mother stated she was not aware of the March of 2017 appointments explaining that her phone might have run out of minutes and she did not see a text message. Id. Mother testified that she later asked Ms. Chmelik about restarting, but Ms. Chmelik told her "it was a waste of everybody's time and that they were going to file for termination of [her] rights." Id. at 230.

Mother acknowledged calling C.J.N. "chunky" at one visit because his diaper was too small. Id. at 204-06. Mother asserted that OYFS was attributing Father's statements to her. Id. at 242. Mother stated that C.J.N. is a "big boy," but insisted she "never made fun of him . . . or called him fat . . . ." Id. at 205. Mother asserted that she asked to have increased levels of

visitations with Child, but was told that her pending criminal charges required line-of-sight visits. Id. at 206.

Mother insisted that she was in substantial compliance with the family service plan. Mother noted that she was permitted to plead guilty to a lesser charge based on her compliance with the conditional guilty plea agreement. Id. at 222-23. Mother emphasized that she was regularly visiting Children, but acknowledged she was usually late for visits. Mother said she has been addressing her addiction and mental health issues. Id. at 187. Mother testified that she underwent a mental health evaluation in February of 2018. Id. at 213. Mother has been seeing Dr. Kuna for mental health therapy. Id. at 187. Mother and has been using Subutex since August 2014 and has not had a relapse. Id. Although the most recent family service plan called for Mother to wean off of Subutex, Mother stated her physicians did not want her to go off the medication while she was pregnant. Id. at 190. Mother testified she explored inpatient rehabilitation programs, but was told no one would take her when she was pregnant. Id. at 191. Mother further noted that she obtained independent housing and was employed. Id. at 195-96.

Referring to missed doctor's appointments and OYFS's refusal to provide increased visitation, Mother asserted that OYFS did not allow her to progress toward reunification with Children. Id. at 226. She summarized her position as follows:

> I just want [Children]. I want to progress. I want to be reunified with [Children].

I'm not asking to have them back today. Give me a chance to actually prove to you that they're safe at home and that I can take care of them. Let me actually follow my family plan like I was supposed to from the beginning. I have nothing holding me back now. I can be unsupervised with them if [OYFS] would allow it.

Id. at 227.

At the conclusion of the hearing, the trial court noted Mother's apparent apathy at prior hearings, her failure to comply with the parenting plan, and its belief that reunification with Mother would be detrimental to Children. See id. at 253-54. On April 10, 2019, the trial court entered the orders involuntarily terminating Mother's parental rights to Children.

Mother timely filed notices of appeal and concise statements of errors complained of on appeal on April 22, 2019. Following a remand from this Court, the trial court authored an opinion pursuant to Pa.R.A.P. 1925(a).[7]

On appeal, Mother raises the following issues:

1. Whether the [trial court] erred as a matter of law and/or manifestly abused its discretion in determining [OYFS] sustained its burden of proving the termination of [Mother's] parental rights is warranted under Sections 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

2. Even if this Court concludes [OYFS] established statutory grounds for the termination of [Mother's] parental rights, whether the [trial court] nevertheless erred as a matter of law and/or manifestly abused its discretion in determining [OYFS] sustained its additional burden of proving the termination of [Mother's] parental rights is in the best interests of [Children]?

_____

[7] Although none of the parties had the benefit of the trial court's Rule 1925(a) opinion when they prepared their briefs, no party has asked to supplement their initial briefs after the trial court filed its opinion.

Mother's Brief at 5.

Mother first argues that OYFS did not meet its burden of proof with respect to Section 2511(a)(2), (5), and (8). Mother asserts:

As argued before the trial court, at least one (1) [j]udge disagreed with [OYFS's] characterization of Mother's compliance and progress with the [family service plan]. If that were not the case, Mother would not have been permitted to withdraw her conditional nolo contendere plea to Endangering the Welfare of a Child in exchange for her nolo contendere plea to Recklessly Endangering Another Person which was specifically premised on her compliance with [OYFS].

Id. at 19 (record citations and some capitalization omitted).

Mother further argues that OYFS mischaracterized her compliance with the requirements of her family service plan. Id. at 16. She notes that although OYFS characterized Mother's compliance with the drug and alcohol objective of her family service plan as moderate, OYFS did not previously object to her participation in a Subutex program and could not offer evidence of a single occasion when Mother relapsed. Id. at 20. Mother contends that she submitted negative drug screens and was not referred to a court treatment program. Id.

Further, Mother argues that the failure of Foster Parent and OYFS to inform Mother of Children's medical appointments amounted to "lost opportunities for education of Mother" and prevented Mother from bonding with Children. Id. Mother similarly contends that she was not given the opportunity for visitation beyond line-of-site visits, and that OYFS was not

justified in maintaining line-of-site visits based on Mother's pending criminal charges. Id. at 21. Mother asserts that the failure to offer unsupervised visitation prevented her from bonding with Children. Id. at 20. Essentially, Mother claims that she would have been able to overcome these deficiencies if she had been afforded the opportunity to attend Children's medical appointments or had unsupervised visits. Id. at 21-22.

We apply the following standard of review when considering an appeal from an order involuntarily terminating parental rights:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds

for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (quoting Matter of Adoption of Charles E.D.M., II, 708 A.2d 88, 91 (Pa. 1998)).

Here, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the court's determinations as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Therefore, we initially analyze the trial court's decision under Section 2511(a)(8) which provides as follows:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of

- 17 -

> parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Once the trial court determines that the twelve-month period exists, it must next consider whether the conditions that led to the child's removal continue to exist. In re A.R., 837 A.2d 560, 564 (Pa. Super. 2003). The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." In re I.J., 972 A.2d 5, 11 (Pa. Super. 2009). Section 2511(a)(8) also requires a court to assess the needs and welfare of the relevant child or children. The needs and welfare analysis "under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent" and must be addressed separately before considering the best interests of a child. See In re C.L.G., 956 A.2d 999, 1008-09 (Pa. Super. 2008) (en banc).

Section 2511(a)(8), however, does not require consideration of a parent's willingness or ability to remedy the conditions that led to the removal of his or her child. In re Adoption of R.J.S., 901 A.2d 502, 511 (Pa. Super. 2006). Further, a trial court is not required to consider whether the agency supplied reasonable reunification services. See In re Adoption of C.J.P., 114 A.3d 1046, 1055 (Pa. Super. 2015) (noting that "nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights").

In its opinion, the trial court concluded that the most concerning aspect of the case was "Mother's repeated denial of responsibility, failure to acknowledge C.J.N.'s near fatality, and minimization of his medical condition." Trial Ct. Op., 1/2/20, at 7. The trial court noted, "Mother demonstrated an inability to conceptualize reality and comprehend her own behavior and the ensuing consequences." Id. The trial court credited OYFS evidence that Mother continued the same behavior, failed to utilize the services provided, and placed Children at risk for future neglect. Id. Furthermore, the trial court noted that shortly after OYFS took Children into custody, Mother neglected prenatal care, missed scheduled C-sections, and suffered a stillbirth. Id.

The trial court explained:

[Children] were removed from Mother's care on February 27, 2017, approximately two (2) years prior to [OYFS's] termination petition. As previously discussed, Mother's apathetic behavior persists, she has been inconsistent in her participation with services provided, and she has demonstrated an inability to apply any skills imparted through those services in parenting the minor children after more than two years. Mother failed to demonstrate any changed behavior. Mother has no drug and alcohol support, and[,] despite Mother's visits with Dr. Kuna, the mental health and behavioral concerns that led to the filing of this dependency action continue to exist and show the risk of future neglect.

\* \* \*

[T]he bond between Mother and C.J.N. is utterly lacking, while the bond between Mother and Z.D.N. is inconsistent. This [c]ourt noted that C.J.N. showed apprehension during visitation, bouts of crying, and excitement when reunited with his paternal grandfather. C.J.N. has been in kinship foster care longer than he has been in the custody of his Mother. Z.D.N. required early intervention support, and has since significantly improved developmentally. Both [Children] attended all medical appointments and present with appropriate immunizations. As

such, this [c]ourt finds termination of Mother's rights to be in [Children's] best interests.

Trial Ct. Op., 1/2/20, at 8-10.

Following our review, we find competent evidence supports the trial court's conclusions that the termination of Mother's parental rights was appropriate under Section 2511(a)(8). Children were removed from Mother's care in February 2017, more than one year prior to the filing of the termination petitions in March 2018, and the hearing in March 2019. Mother did not remedy the primary issue that led to Children's removal, her ability to safely care for their health. Mother failed to complete the Safe-Care module addressing children's health, made inappropriate comments about C.J.N.'s weight, and improperly measured food or water. Moreover, Mother did not acknowledge C.J.N.'s medical diagnosis and continued to believe that his condition, which was classified as a "near fatality," was the result of a cold or the flu. Mother has no bond with C.J.N. While Mother maintains a bond with Z.D.N., the record supports the trial court's finding that Mother continues to "show the risk of future neglect." Id. at 9.

While Mother's argues that her plea of nolo contendere to a lesser criminal charge demonstrates her compliance with OYFS, the testimony regarding OYFS's involvement consisted of Ms. Kanavy recalling that she informed Mother's criminal counsel that visits went well. Regardless of whether Mother interacted well with Children at the visits, the safety concerns

that led to Children's removal continued to exist. See I.J., 972 A.2d at 11-12.

Moreover, we acknowledge that Mother complied with portions of the family service plan. However, Mother's argument that she would be able to parent Children safely if OYFS afforded her greater opportunities to attend Children's medical appointments or have unsupervised visits is entirely speculative. Moreover, it appears that Mother asserts that OYFS should have offered more or different services to her. However, the trial court can reject such arguments. See C.J.P., 114 A.3d at 1055 ("nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights.").

Therefore, having reviewed the record, the trial court's opinion, and Mother's arguments on appeal, we affirm the trial court analysis with respect to Section 2511(a)(8) was appropriate. See T.S.M., 71 A.3d at 267.

Mother next argues that OYFS failed to establish "the best interests of [Children] would be served by terminating [Mother's] parental rights at this time." Mother's Brief at 23 (emphasis in the original). Mother contends that her inability to participate in meaningful visitation programs prevented her from maintaining a bond with Z.D.N. or developing a bond with C.J.N. Id. Mother asserts that she was prevented from progressing past supervised visits, and that OYFS had no reason for not permitting her to do so. Id.

Mother further argues that her efforts were thwarted because she was not notified of Children's medical appointments. Id. at 24.

Section 2511(b) states:

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In In re E.M., [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

T.S.M., 71 A.3d at 267 (some citations omitted).

With respect to Section 2511(b), the trial court concluded that termination of Mother's parental rights best met Children's needs and welfare, reasoning:

- 22 -

> This [c]ourt finds that [Children, who were] placed in kinship foster care for approximately two years[,] deserve the permanency and stability that they are currently enjoying together. [Children's] placement in kinship foster care is appropriate, stable, involved, and supported. Importantly, [Children] have a recognizable bond with each other. [Foster Parent's] bond with [Children] is "positive." For example, "[Children] are very comfortable, very loving, . . . they run up to [him], they run up to [his wife,] . . . they're very comfortable in the home . . . [, Foster Parent] began providing care and nourishment . . . and that's who [C.J.N.] looks to for support and safety. . . . [C.J.N.] calls [Foster Parent] "Bear," so he definitely looks to them as a positive support and his family, that's his family." Moreover, [Foster Parent] has provided increased family interaction and communication with several aunts and uncles.

> Contrastingly, the bond between Mother and C.J.N. is utterly lacking, while the bond between Mother and Z.D.N. is inconsistent. This [c]ourt noted that C.J.N. showed apprehension during visitation, bouts of crying, and excitement when reunited with [Foster Parent]. C.J.N. has been in kinship foster care longer than he has been in the custody of his Mother. Z.D.N. required early intervention support, and has since significantly improved developmentally. Both minor children attended all medical appointments and present with appropriate immunizations. As such, this [c]ourt finds termination of Mother's rights to be in the minor children's best interests.

Trial Ct. Op., 1/2/20, at 9-10 (record citations and some formatting altered).

The credited testimony supports the trial court's determination that it would best serve the needs and welfare of Children to involuntarily terminate Mother's parental rights pursuant to Section 2511(b). Although Mother argues that Foster Parent and OYFS placed barriers to her forming a bond with Children by limiting her ability to attend medical appointments and limiting visits with Children to line-of-sight, Mother's argument is too speculative. Although Mother asserts that she should be given more time to develop or

- 23 -

strengthen a bond with Children, preserving Mother's parental rights would serve only to deny Children the permanence and stability to which they are entitled. See In re Adoption of C.D.R., 111 A.3d 1212, 1220 (Pa. Super. 2015) (reiterating that "it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Accordingly, the trial court did not err in terminating Mother's parental rights to Children pursuant to Section 2511(b). See T.S.M., 71 A.3d at 267.

For the foregoing reasons, we affirm the orders involuntarily terminating Mother's parental rights to Children.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/2020